**FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
In re:

SUSAN C. CHRISTENSON,

            Debtor.

-------------------------------------------------------------x
HOWARD MAGALIFF, as Trustee of the Estate
of Susan C. Christenson,

            Plaintiff,

      -against-

430 CENTRAL DRIVE LLC; 40 LOWER COUNTY
LLC; 94 SOUTH HIGHLAND AVENUE, LLC;
SUSAN C. CHRISTENSON; STEPHEN JONES;
and WILLIAM JONES,

            Defendants.

-------------------------------------------------------------x

Chapter 7

Case No. 20-23224 (KYP)

Adv. Pro. No. 22-07020 (KYP)

**MEMORANDUM DECISION GRANTING THE JONES DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

**APPEARANCES:**

REICH, REICH & REICH, P.C.
*Attorneys for Trustee*
235 Main Street, Suite #450
White Plains, NY 10601
By:    Jeffrey A. Reich, Esq.
          Of Counsel

LAW OFFICES OF SETH L. MARCUS
*Attorneys for Defendants*
670 White Plains Rd.
Scarsdale, NY 10583
By:    Seth L. Marcus, Esq.
          Of Counsel

**HONORABLE KYU YOUNG PAEK**
**UNITED STATES BANKRUPTCY JUDGE**

## INTRODUCTION

In December 2015, Susan C. Christenson ("Debtor") commenced a divorce proceeding against Stephen Jones ("Jones") in the Supreme Court of the State of New York, County of Westchester ("State Court"). That proceeding lasted almost five years and was heavily litigated comprising two trials. The parties ultimately decided to forego further litigation by entering into a settlement, which was formalized by the State Court's entry of the *Amended Judgment of Divorce* on August 4, 2020 ("Amended Divorce Judgment").[1]

After the Debtor filed her Chapter 7 bankruptcy petition, Howard Magaliff – the trustee of the Debtor's bankruptcy estate ("Trustee") – commenced this adversary proceeding to unwind the transfer of the following three properties which were transferred pursuant to the Amended Divorce Judgment: (i) 430 Central Drive, Briarcliff Manor, NY ("430 Central Property"), (ii) 40 Lower County Road, Dennis Port, MA ("40 Lower Property"), and (iii) 94 South Highland Avenue, Ossining, NY ("94 South Property," and collectively, the "Properties").[2] Defendants Jones, his son William Jones ("William"), and the entities that received the transfers have now moved for

---

[1] The Amended Divorce Judgment is attached as Exhibit A to the *Affidavit of Stephen Jones in Support of Motion for Summary Judgment*, signed on Sept. 5, 2024 ("Jones Affidavit") (ECF Doc. # 45). "ECF Doc. #_" refers to documents filed on the electronic docket of this adversary proceeding. "ECF Main Case Doc. # _" refers to documents filed on the electronic docket of the Chapter 7 bankruptcy case, *In re Susan C. Christenson*, Case No. 20-23224 (KYP). "ECF p. _" refers to the page number imprinted across the top of the page by the Court's electronic filing system.

[2] *See generally Amended Complaint*, dated Mar. 9, 2023 ("Amended Complaint") (ECF Doc. # 22).

summary judgment ("Motion") on all claims asserted against them.[3]  The Trustee

opposes the Motion.[4]  For the reasons set forth herein, the Motion is GRANTED.

## JURISDICTION

This Court has jurisdiction over the claims asserted in this adversary proceeding

pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference*

(M-431), dated January 31, 2012 (Preska, C.J.) referring to the Bankruptcy Judges of the

Southern District of New York bankruptcy cases filed in this District as well as

proceedings arising under title 11 or arising in or related to a bankruptcy case.  The

claims asserted in this action are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(H)

and (O).

## BACKGROUND[5]

## A.    The Divorce Proceeding and the Original Divorce Judgment

---

[3]    *See Jones Defendants' Memorandum of Law in Support of Motion for Summary Judgment*,
dated Sept. 6, 2024 ("Defendants Brief") (ECF Doc. # 47) and *Jones Defendants' Reply Memorandum of
Law in Support of Motion for Summary Judgment*, dated Nov. 4, 2024 ("Defendants Reply") (ECF Doc.
# 54).

[4]    *See Plaintiff's Memorandum of Law in Response and Opposition to Defendants' Motion for
Summary Judgment*, dated Oct. 10, 2024 ("Trustee Brief") (ECF Doc. # 50).

[5]    The background is culled from the (i) parties' statements of fact submitted pursuant to Local
Bankruptcy Rule 7056-1, *see Defendants Rule 7056-1 Statement of Facts Not in Dispute in Support of
Motion for Summary Judgment*, dated Sept. 6, 2024 ("Defendants Fact Statement") (ECF Doc. # 48) and
*Plaintiff's Local Rule 7056-1 Statement and Additional Relevant and/or Material Facts and Inferences
Omitted by the Defendants*, dated Oct. 10, 2024 ("Trustee's Fact Statement") (ECF Doc. # 51), (ii) Jones
Affidavit, *Reply Affidavit of Stephen Jones in Further Support of Motion for Summary Judgment*, dated
Nov. 4, 2024 ("Jones Reply Affidavit") (ECF Doc. # 55), and exhibits appended to those affidavits,
(iii) exhibits appended to the attorney *Affirmation of Seth L. Marcus in Support of Motion for Summary
Judgment*, dated Sept. 6, 2024 ("Marcus Affirmation") (ECF Doc. # 46) and the attorney *Declaration of
Jeffrey A. Reich in Support of Plaintiff's Memorandum of Law and Statement of Facts in Response and
Opposition to Defendants' Motion for Summary Judgment*, dated Oct. 10, 2024 ("Reich Declaration")
(ECF Doc. # 52), and (iv) matters for which the Court may take judicial notice.  The Trustee Fact
Statement was divided into two parts: an initial part responding to the facts asserted in the Defendants
Fact Statement, and a latter part stating additional facts and inferences starting on page 11.  References to
paragraphs in the latter part of the Trustee Fact Statement will be denoted as "Trustee Additional Fact
¶ _."

The Debtor and Jones were married on June 22, 1991, and had four children together. (*Amended Findings of Fact and Conclusions of Law*, dated Aug. 4, 2020 ("State Court FF & CL") ¶¶ 3 and 5.)[6] In December 2015, the Debtor commenced a divorce proceeding against Jones in State Court ("Divorce Proceeding"). (Jones Affidavit ¶ 3.) The Divorce Proceeding involved two separate trials: one on custody of the children and a second on the division of marital assets. (*Id*. ¶ 4.) The latter of the two trials occurred between March and April of 2018 and culminated in the Judgment of Divorce entered by the Court on April 19, 2019 ("Original Divorce Judgment").[7] The principal terms of the Original Divorce Judgment were as follows:

- The Debtor was awarded sole custody of the minor children with visitation rights granted to Jones (Original Divorce Judgment ¶¶ 2, 5, 8-9);[8]

- The three Properties, as well as a fourth property located at 35 South State Road, Briarcliff Manor, NY ("35 South Property"), were ordered to be sold, and the sale proceeds (after satisfaction of mortgages, taxes, broker fees, and closing costs) were to be divided evenly between the Debtor and Jones subject to various credits given in favor of the Debtor (*id*. ¶¶ 10-13);[9]

- The Debtor was awarded $206,250 representing 75% of Jones' interest in an entity called Pacem Holdings, LLC, and $103,000 representing 35% of the value of Jones' law practice (*id*. ¶¶ 14-15);

- Jones was ordered to make monthly maintenance payments to the Debtor in the amount of $2,400, and monthly child support payments to the Debtor in the amount of $3,667.86 (*id*. ¶¶ 17-18);

---

[6]    A copy of the State Court FF & CL is attached as Exhibit B to the Jones Affidavit.

[7]    A copy of the Original Divorce Judgment is attached as Exhibit H to the Reich Declaration.

[8]    The two eldest children were over the age of eighteen when the Original Divorce Judgment was entered. (Original Divorce Judgment ¶ 2.) As of this writing, all four children are over the age of eighteen.

[9]    The Debtor was appointed to be the receiver of the Properties with responsibility to, among other things, sell the Properties consistent with the Original Divorce Judgment. (Original Divorce Judgment ¶ 23.)

- Financial obligations pertaining to the children were split with the Debtor being obligated to pay 29% and Jones being obligated to pay 71% including for (i) unreimbursed healthcare costs, (ii) college tuition and related costs, and (iii) private school tuition (*id.* ¶¶ 20, 22, 26);

- The Debtor was awarded one-half of Jones' 401(k) valued at $186,777 as well as certain related credits (*id.* ¶ 30);

- Jones was directed to pay certain of the Debtor's legal fees totaling $118,500 (*id.* ¶ 32); and

- The Debtor and Jones were directed to share equally in the repayment of a $22,000 Visa credit card bill (*id.* ¶ 31).

## B.    The Settlement Stipulations

The entry of the Original Divorce Judgment did not end the Divorce Proceeding. Jones filed a notice of appeal of the Original Divorce Judgment and sought entry of several orders to show cause to prevent the Debtor from selling the Properties. (Defendants Fact Statement ¶¶ 17-18, 31.)  During the Divorce Proceeding, the Debtor changed her attorney on several occasions; the attorneys in the order of their appearance were as follows: Timothy Brennan, Mitchell Lieberman, Joseph Petito ("Petito"), and finally Barry Nesson ("Nesson").  (Defendants Fact Statement ¶¶ 23, 27-28; Trustee Fact Statement ¶ 23.)  Petito was retained by the Debtor around August 2018, and Nesson was retained by the Debtor around March 2019.  (Original Divorce Judgment at 1; Defendants Fact Statement ¶ 27.)[10]  Following Petito's entry into the Divorce Proceeding and continuing through Nesson's retention, Jones (who is an attorney and was representing himself) discussed the possibility of a settlement of the Divorce Proceeding with Petito and Nesson.  (Defendants Fact Statement ¶ 25; Trustee

---

[10]    Nesson was originally hired to represent the Debtor in her role as receiver for certain real property that was part of the marital estate.  (Original Divorce Judgment ¶ 29.)

Fact Statement ¶ 25.) These discussions continued before and after the State Court issued its Original Divorce Judgment and throughout the various motion and appellate practice that occurred thereafter. (Defendants Fact Statement ¶ 26; *see* Reich Declaration, Ex. G (correspondence among Jones, Petito, and Nesson); Jones Affidavit, Ex. F (same).)

These negotiations led to a settlement of the Divorce Proceeding, which was memorialized in two stipulations executed by the Debtor and Jones on November 1, 2019.[11] (Defendants Fact Statement ¶ 32.) One stipulation covered the disposition of the 430 Central Property and the 94 South Property ("Real Property Stipulation"), and the other covered the disposition of the 40 Lower Property as well as all other matters between the parties ("Global Stipulation," and together, the "Settlement Stipulations").[12]

With respect to the Properties, the Settlement Stipulations provided that the Debtor would transfer her ownership interest in the mortgaged Properties in exchange for payments by Jones' parents ("Parents") as follows:

| Property | Payment by Parents | Other Terms |
|---|---|---|
| 430 Central | $80,000 | • Jones will be responsible for transactional costs.<br>• Parties will cooperate with Putnam County Savings Bank ("PCSB") to remove the Debtor from the mortgage.[13] |

---

[11]    At the time the Settlement Stipulations were executed, Petito had been relieved as counsel, and the Debtor was represented by Nesson alone. (Defendants Fact Statement ¶ 35.)

[12]    Copies of the Real Property Stipulation and Global Stipulation are attached as Exhibits C and D to the Jones Affidavit, respectively. The 35 South Property was sold prior to the entry of the Settlement Stipulations to a third-party purchaser, and the proceeds were used (i) to satisfy outstanding tax debt on that property, (ii) for maintenance and child support payments to the Debtor through May 31, 2019, and (iii) to cover the Debtor's legal fees owed to Julie Cherico, Esq. and the children's orthodontist bills. (State Court FF & CL ¶ 18; Global Stipulation at 1-2.)

[13]    *See* Real Property Stipulation at 2-3.

| Property | Payment by Parents | Other Terms |
|---|---|---|
| 94 South | $60,000 | • Jones will be responsible for repayment of a loan from Sterling National Bank that was used to renovate the property.<br>• Parties will cooperate with PCSB to remove the Debtor from the mortgage.[14] |
| 40 Lower | $60,000 | • Upon the Debtor's request, Jones will seek to refinance with one or both Parents as co-applicants or guarantors to remove the Debtor as an obligor under the existing mortgage.[15] |

In addition to the $200,000 to be paid to the Debtor as set forth above, the Real Property Stipulation provided that the Debtor would receive a supplemental $50,000 payment. The parties stipulated that the $250,000 in total payments "to [the Debtor] represent buyouts of [the Debtor's] one half equity in the [P]roperties. . . . The parties agree that the consideration paid to [the Debtor] for these [P]roperties is fair and reasonable and is based on real estate brokerage recommendations for listing price minus mortgage indebtedness and normal closing costs." (Real Property Stipulation at 3-4.) The parties acknowledged that the Parents' willingness to purchase the Debtor's share in the Properties was based on their interest in preserving the Properties for the ultimate benefit of the four children. (*Id.* at 1-3.)

The other principal terms of the Settlement Stipulations were as follows:

- The Debtor and Jones will share custody of the children (Global Stipulation at 4);

- The Debtor will be responsible for the children's college bills that she has already paid, or borrowed to pay via loans, in her own name. Upon depletion of the 529

---

[14]   *See* Real Property Stipulation at 3.

[15]   *See* Global Stipulation at 2.

savings accounts, Jones will pay the remaining college bills for the children (*id*. at 3);

- Jones will make payments to the Debtor in the amount of $3,000 per month from December 2019 through December 2024 comprising (i) $2,400 for monthly maintenance, and (ii) $600 for Jones' pro rata share of monthly insurance premiums for coverage for the children (*id*.);

- Neither party shall pay child support to the other party, but Jones will pay all direct expenses of the children through college graduation (*id*. at 3-4);[16]

- Jones will be responsible for paying the mortgage arrears and real estate taxes totaling $60,000 on the 430 Central Property and 40 Lower Property (*id*. at 4);[17] and

- The parties will withdraw all outstanding motions and appeals in the Divorce Proceeding, and Jones will prepare an amended judgment of divorce consistent with the Settlement Stipulations for submission to the State Court. (*Id*. at 5-6; Real Property Stipulation at 4.)

## C.   The Amended Divorce Judgment

The Amended Divorce Judgment and corresponding State Court FF & CL were approved and signed by State Court Justice David F. Everett on August 4, 2020. (Amended Divorce Judgment at 9; State Court FF & CL at 9.)[18]  Under the Amended Divorce Judgment, the consideration the Debtor was to receive in exchange for her equity interest in the Properties differed from the cash payments totaling $250,000 as set forth in the Settlement Stipulations.  The change was required because the Parents, who were retired and living on a fixed income, were unable to obtain the financing

---

[16]     The only exception was summer camp for one of the children, which the Debtor would be responsible for should she elect to send the child.  (Global Stipulation at 3.)

[17]     At the time the parties entered into the Settlement Stipulations, foreclosure notices had been issued on one or more of the marital real properties.  (Defendants Fact Statement ¶ 34.)

[18]     The Debtor "Accepted and Agreed" to the Amended Divorce Judgment and State Court FF & CL by signing each document.  (*See* Amended Divorce Judgment at 9; State Court FF & CL at 10.)

necessary to pay the $250,000. (Defendants Fact Statement ¶ 42.) The alternative

consideration under the Amended Divorce Judgment comprised the following:

- Jones will relieve the Debtor of her obligation to pay an existing $50,000 Parent Plus loan for William's education, which would have been the Debtor's obligation under the Settlement Stipulations (*compare* Global Stipulation at 3 (requiring the Debtor to pay for the children's educational loans taken out in her name) *with* Amended Divorce Judgment at 4 (stating that Jones will assume the $50,000 Parent Plus loan); *see also* Jones Affidavit ¶ 20(a));

- Jones will extend maintenance payments to the Debtor for an additional three years beyond the term provided for in the Settlement Stipulations, and at a higher rate, resulting in additional maintenance payments totaling $100,080 (*compare* Global Stipulation at 3 (providing that Jones will pay the Debtor monthly maintenance payments of $2,400 through December 2024) *with* Amended Divorce Judgment at 6 (providing that Jones will pay the Debtor (i) monthly maintenance payments of $2,400 through December 2024, (ii) monthly maintenance payments of $2,780 from January 2025 through December 2027, and a one-time additional payment of $2,500 on or before April 30, 2020); *see also* Jones Affidavit ¶ 20(b));

- Jones will pay the Debtor's capital gains tax for the 2019 sale of the 35 South Property anticipated to be $75,000 (*see* Amended Divorce Judgment at 6; Jones Affidavit ¶ 20(c); *see also* Jones Affidavit, Ex. E (copy of $75,000 check payable to the IRS));[19]

- Jones will pay $25,000 to Nesson in complete satisfaction of legal fees owed by the Debtor to Nesson (*see* Amended Divorce Judgment at 7; *see also* Jones Affidavit ¶ 20(d)); and

- Jones will relieve the Debtor's obligation to pay $11,000 representing her one-half portion of a VISA credit card bill (*compare* Original Divorce Judgment ¶ 31 (providing that the Debtor and Jones shall share equally in the repayment of $22,000 owed to VISA) *with* Amended Divorce Judgment at 7 (stating that Jones waives the Debtor's $11,000 contribution toward the balance owed to VISA); *see also* Jones Affidavit ¶ 20(e)).

---

[19]     The payment to the IRS was made from the Parents' bank account.

The Amended Divorce Judgment included a very extensive description of the total

financial consideration provided to the Debtor in exchange for the transfer of her

interest in the mortgaged Properties as follows:

> [The Debtor] understands that under New York Law all support for all children ends no later than attaining age twenty-one; and that the children of the parties will remain in college during junior and senior years of college after attaining twenty-one years of age and the cost of such post emancipation college expense is understood by both parties to exceed $250,000; and [the Debtor] being greatly desirous that [Jones] be responsible for 100 percent of said post-emancipation college cost; and [the Debtor] being desirous of [Jones] paying for the children's health insurance costs post-emancipation while in college; and [the Debtor] being desirous that [Jones] provide the children with the use of an automobile and pay for the cost of auto insurance; and [the Debtor] not wanting to pay child support to [Jones] for any child, and [Jones] waiving receipt of child support for all four children notwithstanding that the elder sons of the parties reside with [Jones]; and [Jones] demanding and [the Debtor] acceding to the demand that in consideration for his promises and all the orders contained herein, that the real estate held by the [Debtor] be transferred and the parties agreeing that the consideration set forth in this paragraph and elsewhere in this [Amended Divorce Judgment] exceeds by more than $250,000 the total relief to [the Debtor] and the children contained in the [Original Divorce Judgment] and, moreover, that the post-emancipation college costs are by statute beyond what any court could direct and that [Jones] has voluntarily consented to an Order to make such payments and other payments herein only upon the agreement of the [Debtor] to transfer and preserve the real estate, and upon [the Debtor's] understanding and belief that absent her cooperation and agreement as to the real estate, that [Jones] would not have paid for the post-emancipation college expenses of the children and various substantial other payments set forth herein; and that harmful and ruinous litigation and appeals would have continued for years; and further, the sums that [the Debtor] has induced [Jones] to pay pursuant to this [Amended Divorce Judgment] greatly exceed the total value of equitable distribution and maintenance set forth in the [Original Divorce Judgment]; and the values of assets on which the [Original Divorce Judgment] was based were based on [the Debtor's] assertions of values at trial as well as expert reports and testimony as to real estate values.  In consideration of all [Jones'] payments, undertakings and obligations as ordered in this [Amended Divorce Judgment], the [Debtor] shall promptly deliver the membership certificates for 94 South Highland Avenue, LLC to [Jones],

> transferring the membership interest in that LLC to the parties' son
> William; and [the Debtor] shall further deliver to [Jones'] business
> address a deed for [the 430 Central Property] to the LLC known as 430
> Central Drive, LLC and a deed to [the 40 Lower Property] to 40 Lower
> County, LLC.

(Amended Divorce Judgment at 5-6.)  The State Court found that the terms of the

parties' settlement were "fair and equitable at the time of the making of such agreement

and are not unconscionable at the time of the entry of the [Amended Divorce

Judgment]."  (State Court FF & CL ¶ 11.)

Jones states that he remains in full compliance with the terms of the Amended

Divorce Judgment.  (Jones Reply Affidavit ¶¶ 10-11.)  As required under that judgment,

Jones paid $25,000 to Nesson to satisfy legal fees owed by the Debtor.  Around

September 2020, Nesson paid $10,000 of those funds to the Debtor.  (Trustee Fact

Statement ¶ 7.)  Nesson testified that he made that payment to the Debtor, in part, as

consideration for her consent to disengage him as counsel.  (*Deposition of Barry

Nesson*, dated Sept. 1, 2021 ("Nesson Depo.") at 142:23-143:16.)[20]  The Debtor similarly

testified that the payment was in consideration for terminating the engagement and

added that she agreed to exculpate Nesson as part of the termination:

> Q:    And why did [Nesson] return $10,000 to you?
>
> A:    He could see what a difficult situation it was.  I think he asked that I
> sign an – that I no longer retain him and that I sign an agreement that I
> would not sue him or go after him for any reason regarding the case.  He
> just wanted to finally completely end the relationship, and I did have to
> sign that I was not going to pursue him for any purposes related to the
> case.
>
> Q:    And in consideration for signing that document, he returned
> $10,000 to you?

---

[20]    A copy of the Nesson Depo. is attached as Exhibit A to the Reich Declaration.

A.    Yes.

(*Deposition of Susan C. Christenson*, dated July 28, 2021 ("Christenson Depo.") at

39:2-13.)[21]  The Debtor, in turn, spent the $10,000 to pay legal fees owed to attorneys

who represented the children during the Divorce Proceeding.  (*Id*. at 38:8-22.)

## D.    The Bankruptcy Filing and this Adversary Proceeding

The Debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code on

November 25, 2020.  (ECF Main Case Doc. # 1.)  The Trustee was duly appointed the

Chapter 7 trustee of the Debtor's bankruptcy estate.  The Trustee commenced this

adversary proceeding on March 7, 2022, and filed the Amended Complaint[22] on March

15, 2023 against Jones, William, 430 Central Drive LLC ("430 Central LLC"), 40 Lower

County LLC ("40 Lower LLC"), 94 South Highland Avenue, LLC ("94 South LLC," and

collectively with Jones, William, 430 Central LLC, and 40 Lower LLC, the "Jones

Defendants"), and the Debtor (the Debtor and the Jones Defendants will collectively be

referred to as the "Defendants").  By the Amended Complaint, the Trustee alleged that

the Debtor did not receive fair consideration in exchange for the transfer of her interest

in the Properties (Amended Complaint ¶¶ 51-55, 65-68, 75-85, 91), Nesson – on behalf

of the Debtor – and Jones restructured the transactions to frustrate and defraud the

Debtor's creditors (*id*. ¶¶ 62-63, 72, 84, 87), and the transfer of her interest in the

Properties rendered the Debtor insolvent (*id*. ¶¶ 60, 72, 90).  The Amended Complaint

contained ten counts as follows:

---

[21]    A copy of the Christiansen Depo. is attached as Exhibit G to the Reich Declaration.

[22]    The original complaint was dismissed on May 27, 2022 (*see* ECF Doc. # 11), but the Court granted
the Trustee leave to amend his pleading on March 15, 2023.  (*See* ECF Doc. # 21.)

| COUNT | AMENDED COMPLAINT ¶¶ | CLAIM DESCRIPTION |
|:-----:|:--------------------:|-------------------|
| I | 95-109 | Avoidance and recovery of the transfer of Debtor's interest in the 430 Central Property ("430 Central Transfer") as an intentional fraudulent transfer under sections 544(b), 548(a)(1)(A), and 550(a) of the Bankruptcy Code and section 276 of the New York Debtor and Creditor Law ("N.Y. DCL"). |
| II | 110-115 | Avoidance and recovery of the 430 Central Transfer as a constructive fraudulent transfer under sections 273-275 of the N.Y. DCL and sections 544(b) and 550(a) of the Bankruptcy Code. |
| III | 116-121 | Avoidance and recovery of the 430 Central Transfer as a constructive fraudulent transfer under section 548(a)(1)(B) of the Bankruptcy Code. |
| IV | 122-137 | Avoidance and recovery of the transfer of Debtor's interest in the 40 Lower Property ("40 Lower Transfer") as an intentional fraudulent transfer under sections 544(b), 548(a)(1)(A), and 550(a) of the Bankruptcy Code and section 276 of the N.Y. DCL. |
| V | 138-142 | Avoidance and recovery of the 40 Lower Transfer as a constructive fraudulent transfer under sections 273-275 of the N.Y. DCL and sections 544(b) and 550(a) of the Bankruptcy Code. |
| VI | 143-148 | Avoidance and recovery of the 40 Lower Transfer as a constructive fraudulent transfer under section 548(a)(1)(B) of the Bankruptcy Code. |
| VII | 149-168 | Avoidance and recovery of the transfer of Debtor's interest in the 94 South Property ("94 South Transfer") as an intentional fraudulent transfer under sections 544(b), 548(a)(1)(A), and 550(a) of the Bankruptcy Code and section 276 of the N.Y. DCL. |
| VIII | 169-173 | Avoidance and recovery of the 94 South Transfer as a constructive fraudulent transfer under sections 273-275 of the N.Y. DCL and sections 544(b) and 550(a) of the Bankruptcy Code. |
| IX | 174-179 | Avoidance and recovery of the 94 South Transfer as a constructive fraudulent transfer under section 548(a)(1)(B) of the Bankruptcy Code. |

| COUNT | AMENDED COMPLAINT ¶¶ | CLAIM DESCRIPTION |
|---|---|---|
| X | 180-184 | Recovery of the value of the transfers of the Debtor's interest in the Properties on the basis that the Defendants were unjustly enriched by the transfers. |

Counts I, IV, and VII will be referred to collectively as the "Intentional Fraud Claims,"
Counts II, III, V, VI, VIII, and IX will be referred to collectively as the "Constructive
Fraud Claims," and Count X will be referred to as the "Unjust Enrichment Claim."

The Jones Defendants filed an answer to the Amended Complaint on May 2,
2023, and the Debtor filed her answer on May 16, 2023. (ECF Doc. ## 24, 26.)

E.     **The Instant Motion**

The Jones Defendants filed their Motion on September 6, 2024 seeking summary
judgment on all claims asserted against them in the Amended Complaint. They argued
that the Constructive Fraud Claims should be dismissed because transfers of marital
property pursuant to a valid divorce judgment conclusively establishes that such
transfers were made in exchange for "reasonably equivalent value" and "fair
consideration." (Defendants Brief at 14-17.) The Intentional Fraud Claims should be
dismissed because the settlement embodied in the Amended Divorce Judgment was the
result of extensive negotiation among the parties, and there was no evidence that the
Debtor transferred her interest with an intent to defraud creditors. (*Id*. at 17-19.) The
Unjust Enrichment Claim should be dismissed because it is duplicative of the fraudulent
transfer claims. (*Id*. at 19-20.)

The Jones Defendants also asserted that summary judgment was proper
pursuant to the doctrines of judicial estoppel and/or election of remedies. Specifically,
the Jones Defendants referenced a separate adversary proceeding brought by the

Trustee against Nesson – *Magaliff v. Nesson*, Adv. P. No. 22-07019 ("Nesson Action") –
in which the Trustee alleged, among other things, that Nesson breached his fiduciary
duty owed to the Debtor and committed legal malpractice while representing the Debtor
in the Divorce Proceeding. (*See generally Complaint*, dated Mar. 7, 2022 (ECF Nesson
Action Doc. # 1).) Nesson agreed to pay the Trustee $82,500 to settle the Nesson Action
(*see* ECF Nesson Action Doc. # 10 (motion to approve settlement)), and this Court
approved the settlement pursuant to Federal Bankruptcy Rule 9019(a). (*See* ECF
Nesson Action Doc. # 12 (order approving settlement).) According to the Jones
Defendants, the Trustee took positions in the Nesson Action which are inconsistent with
the positions he is now taking in this adversary proceeding and affirmatively elected to
seek recovery from Nesson. (Defendants Brief at 9-13.)

The Trustee opposed the Motion by filing the Trustee Brief on October 10, 2024.
Although transfers pursuant to a divorce judgment are generally made for reasonably
equivalent value, the Trustee argued that the negotiations leading to the Amended
Divorce Judgment were fraught with fraud, collusion, and irregularities. (Trustee Brief
at 11-14.) The Trustee also asserted that "badges of fraud" were present from which the
Court may infer fraudulent intent. (*Id.* at 16-22.) Further, the Unjust Enrichment
Claim was not duplicative of the fraudulent transfer claims. (*Id.* at 22-24.) Last, the
Trustee contended that judicial estoppel does not apply here because the allegations in
the Amended Complaint, and those made in the Nesson Action, are not inconsistent,
and are instead, complimentary. (*Id.* at 1, 8-11.)

The Jones Defendants responded to the Trustee's arguments on November 4,
2024 by filing the Defendants Reply, and the Court heard oral argument on November
21, 2024 and took the matter under advisement.

## DISCUSSION

**A.    Summary Judgment Standard**

Under Rule 56 of the Federal Rules of Civil Procedure, made applicable hereto

pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure, summary

judgment is proper "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). The movant bears the burden of establishing that no genuine issue of material

fact exists. *Bustamante v. KIND, LLC*, 100 F.4th 419, 432 (2d Cir. 2024) (quoting

*Souza v. Exotic Island Enters., Inc.*, 68 F.4th 99, 108 (2d Cir. 2023)). "A fact is material

if it might affect the outcome of the suit under the governing law, and an issue of fact is

genuine if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir.

2012) (quoting *Niagara Mohawk Power Corp. v. Hudson River-Black Regulating Dist.*,

673 F.3d 84, 94 (2d Cir. 2012)).

Once the movant has carried its initial burden, "the nonmovant must set forth

specific facts showing that there is a genuine issue for trial." *Bustamante*, 100 F.4th at

432 (citation omitted). When deciding whether a genuine dispute exists as to a material

fact, all ambiguities must be resolved, and all reasonable inferences must be drawn, in

favor of the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). However,

"[c]onclusory allegations, conjecture, and speculation are insufficient to create a

genuine issue of fact." *Shannon v. New York City Transit Auth.*, 332 F.3d 95, 99 (2d

Cir. 2003) (quoting *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998)) (alteration

omitted); *accord Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574,

586 (1986) (When the moving party has carried its burden, "its opponent must do more

16

than simply show that there is some metaphysical doubt as to the material facts."). Although the Court must draw reasonable inferences in favor of the nonmovant, it need not "credit unsupported factual allegations and innuendos . . . nor make unreasonable inferences from circumstantial evidence proffered by nonmovant." *Tai-Sun Plastic Novelties, Ltd. v. Haschel Exp. Corp.*, No. 03 CV 1414 (MP), 2003 WL 22966285, at *1 (S.D.N.Y. Dec. 16, 2003) (quoting *Azurite Corp., Ltd. v. Amster & Co.*, 844 F. Supp. 929, 936 (S.D.N.Y. 1994) (Sotomayor, J.) and citing *Sandman v. Fed. Sav. Loan & Ins. Corp.*, 942 F.2d 793 (9th Cir. 1991)).

## B.    The Constructive Fraud Claims

Counts III, VI, and IX of the Amended Complaint are brought under section 548(a)(1)(B) of the Bankruptcy Code, which provides:

> (a)(1) The trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made . . . within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily . . .
>
> > (B)(i) received less than a reasonably equivalent value in exchange for such transfer . . . and
> >
> > > (ii)(I) was insolvent on the date that such transfer was made . . . or became insolvent as a result of such transfer . . . .

11 U.S.C. § 548(a)(1)(B). Under section 544(b) of the Bankruptcy Code, the Trustee may assert a claim under state fraudulent transfer law if there is an unsecured creditor who could pursue the action.[23] In Counts II, V, and VIII, the Trustee relies on the prior iteration of New York's constructive fraudulent conveyance statute, which provides for

---

[23]    Section 544(b)(1) of the Bankruptcy Code provides that "the trustee may avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title." The Debtor had several unsecured creditors at the time she conveyed her interest in the Properties. (Trustee Additional Fact ¶ 6.)

the avoidance of conveyances made without "fair consideration." *See* N.Y. DCL § 273

("Every conveyance made . . . by a person who is or will be thereby rendered insolvent is

fraudulent as to creditors without regard to his actual intent if the conveyance is

made . . . without fair consideration.") (repealed 2019).[24] "Courts use the term 'fair

consideration' interchangeably with 'reasonably equivalent value,' relevant in

Bankruptcy Code section 548 fraudulent transfer claims, when examining constructive

fraud claims." *Off. Comm. of Unsecured Creditors v. Leucadia Nat'l Corp.* (*In re Vivaro

Corp.*), 524 B.R. 536, 550 (Bankr. S.D.N.Y. 2015); *accord Picard v. Madoff* (*In re

Bernard L. Madoff Inv. Sec. LLC*), 458 B.R. 87, 110 (Bankr. S.D.N.Y. 2011).

The Jones Defendants argue that the Constructive Fraud Claims should be

dismissed because the Debtor received reasonably equivalent value for the transfer of

her interest in the Properties.

### 1.    Reasonably Equivalent Value

In determining whether a transfer is made for "reasonably equivalent value,"

courts "need not strive for mathematical precision" but "must keep the equitable

purposes of the statute firmly in mind, recognizing that any significant disparity

between the value received and the obligation assumed . . . will have significantly

harmed the innocent creditors." *Kirschner v. Citigroup Glob. Mkts. Inc.* (*In re Trib. Co.

Fraudulent Conv. Litig.*), 10 F.4th 147, 172 (2d Cir. 2021) (quoting *Rubin v. Mrfs.*

---

[24] The fraudulent transfer provisions of the N.Y. DCL were amended on December 6, 2019 by enactment of the Uniform Voidable Transactions Act, but the amendments only apply to transfers made after April 4, 2020 – the amendment's effective date. *Ray v. Ray*, 799 F. App'x 29, 31 n.1 (2d Cir. 2020) (summary order). Although the Amended Divorce Judgment was signed by the State Court on August 4, 2020, the Debtor's transfer of her interest in the Properties occurred around December 2019. (*See* Christenson Depo. at 72:13-75:9; 119:16-22.) Thus, the transfers at issue occurred prior to the enactment of the Uniform Voidable Transactions Act.

*Hanover Tr. Co.*, 661 F.2d 979, 994 (2d Cir. 1981)), *cert. denied sub nom. Kirschner v. FitzSimons*, 142 S. Ct. 1128 (2022).  Several courts have ruled that, in the absence of fraud, collusion or other irregularity, a valid divorce judgment or decree conclusively establishes "reasonably equivalent value" within the meaning of 11 U.S.C. § 548(a)(1)(B). *Batlan v. Bledsoe* (*In re Bledsoe*), 569 F.3d 1106, 1108, 1112 (9th Cir. 2009); *Ingalls v. Erlewine* (*In re Erlewine*), 349 F.3d 205, 211-13 (5th Cir. 2003); *Pryor v. Zerbo* (*In re Zerbo*), 397 B.R. 642, 654 (Bankr. E.D.N.Y. 2008).[25]

These courts relied on *BFP v. Resol. Tr. Corp.*, in which the Supreme Court ruled that the price paid pursuant to a non-collusive, real estate mortgage foreclosure sale conclusively satisfied the reasonable equivalence standard under 11 U.S.C. § 548(a)(1)(B).  511 U.S. 531, 545 (1994).  In so ruling, the Supreme Court explained that federal statutes may not impinge upon an important state interest unless "the federal statutory purpose [is] clear and manifest."  *Id.* at 544 (citation omitted).  The Court identified the state's interest in the security of titles to real property and the finality of real estate foreclosure sales.  *Id.* (if the Court adopted the petitioner's interpretation, "every piece of realty purchased at foreclosure would be under a federally created cloud").  Absent a "clear and manifest" federal statutory purpose, "the Bankruptcy Code will be construed to adopt, rather than to displace, pre-existing state law."  *Id.* at 544-45.

---

[25]    The same is true when analyzing "fair consideration" under the relevant provisions of the N.Y. DCL.  *See Commodity Future Trading Comm'n v. Walsh*, 951 N.E.2d 369, 377-78 (N.Y. 2011) (hereinafter, "*Walsh*") ("courts have repeatedly stated that 'transfers made pursuant to a valid separation agreement incorporated into a divorce decree are presumed to have been made for fair consideration'") (quoting *Durand v. Ackerman* (*In re Durand*), No. 09-CV-3372 (JFB), 2010 WL 3834587, at *7 (E.D.N.Y. Sept. 27, 2010) and citing other supporting authorities).

Although the *BFP* ruling was explicitly limited to real estate mortgage foreclosures,[26] the Fifth Circuit in *Erlewine*, and the Ninth Circuit in *Bledsoe*, applied *BFP*'s rationale to fraudulent transfer actions seeking to unwind the division of marital property under a divorce decree.  The Courts of Appeals observed that states have an important interest in the regulation of marriage and divorce.  *Bledsoe*, 569 F.3d at 1112 ("The state's traditional interest in the regulation of marriage and divorce is at least as powerful as its traditional interest in regulating sales of real property."); *Erlewine*, 349 F.3d at 212 ("we should hesitate before we impute to Congress an intent to upset the finality of judgments in an area as central to state law as divorce decrees"); *see also id.* ("The Trustee's argument, if adopted, would apparently subject every divorce decree to scrutiny in the bankruptcy court, so long as the divorce court divided the community property unequally.").  Likewise, New York has a strong interest in respecting the finality of divorce decrees and judgments.  *Walsh*, 951 N.E.2d at 378 (recognizing New York's "strong public policy of ensuring finality in divorce proceedings"); *see also id.* at 375-76.

Given New York's interest in respecting the finality of divorce judgments, and the absence of a "clear and manifest" federal purpose to the contrary, this Court agrees with the rulings in *Bledsoe*, *Erlewine*, and *Zerbo* that a valid divorce judgment or decree conclusively establishes "reasonably equivalent value" within the meaning of 11 U.S.C. § 548(a)(1)(B) absent fraud or collusion.

---

[26]    *See BFP*, 511 U.S. at 537 n.3 ("We emphasize that our opinion today covers only mortgage foreclosures of real estate. The considerations bearing upon other foreclosures and forced sales (to satisfy tax liens, for example) may be different.").

Here, Jones and the Debtor negotiated a settlement of the Divorce Proceeding by entering into the Settlement Stipulations, and a modified version of the settlement was approved by the State Court through the entry of the Amended Divorce Judgment.[27] The Trustee nonetheless argues that the Jones Defendants should not be granted summary judgment on the Constructive Fraud Claims because there are, at minimum, disputed issues of fact which suggest that the settlement was the product of fraud or collusion. The Trustee's arguments are addressed in the following section.

### 2.    The Trustee's Arguments

The Trustee's multiple contentions that the deliberations leading to the Amended Divorce Judgment were tainted by fraud and collusion lack merit. First, the Trustee claims that the forms of consideration provided by Jones under the settlement were "empty, false and illusory." (Trustee Brief at 3; *see also id.* at 5-6, 15.) Consideration that may be provided in a divorce proceeding is broader than tangible assets and can include "myriad types of consideration" such as adjustments to spousal maintenance obligations, adjustments to child support obligations, relinquishment or waiver of rights and remedies otherwise conferrable by law, and child custody and visitation concessions. *Walsh*, 951 N.E.2d at 377 (citing supporting authorities); *accord Pereira v. Capala*, 17-CV-3434, 2020 WL 13157532, at *11-12 (E.D.N.Y. Aug. 6, 2020). Further, divorcing parties may ultimately agree to a division of marital property to bring "closure to what can be a difficult, expensive, emotional and energy consuming process." *Zerbo*, 397 B.R. at 654.

---

[27]    When determining whether reasonably equivalent value was provided, a divorce settlement, which is approved by a matrimonial court, is given the same effect as a post-trial division of marital assets by such court. *Zerbo*, 397 B.R. at 654.

Here, Jones provided multiple forms of valuable consideration to settle what had been a contentious five-year Divorce Proceeding.  Far from being "illusory," Jones provided, and continues to provide, the following as consideration under the Amended Divorce Judgment:

- Monthly maintenance payments to the Debtor of $2,400 from December 1, 2019 through December 2024, and an increase to $2,780 per month from January 2025 through December 2027 (Amended Divorce Judgment at 6);

- Assumption of a $50,000 Parent Plus loan incurred for William's college tuition (*id.* at 4), which would otherwise have been the Debtor's sole obligation to repay;

- Satisfaction of the capital gains tax owed for the sale of the 35 South Property in the estimated amount of $75,000 (*id.* at 6);

- Payment of substantially all basic necessities for each child through college graduation (*e.g.*, tuition, other college expenses, personal expenses, computers, cell phones, food, clothing, etc.), including after each child reaches the age of 21 until the child graduates from college (*id.* at 4-6);[28]

- Expenses related to a Ford Explorer provided to the children until the children graduate from college (*id.* at 5);

- Satisfaction of mortgage arrears and real estate taxes owed on the 430 Central Property and the 40 Lower Property estimated to be $60,000 (*id.* at 6);

- Assumption of the Debtor's $11,000 share of a credit card bill owed to VISA (*id.* at 7); and

- Payment of the Debtor's legal fees to Nesson in the amount of $25,000.  (*Id.*)

The State Court found, *inter alia*, that (i) the value of Jones' payment of the children's college tuition and expenses after the children attained age 21 exceeded $250,000 (*id.* at 5); (ii) the value of the total consideration provided to the Debtor and the children in the Amended Divorce Judgment exceeded the value previously provided in the Original Divorce Judgment by more than $250,000 (*id.*); (iii) the parties have agreed to

---

[28]    The state court has discretion to require parents to contribute to a child's college education pursuant to a divorce judgment.  *Cimons v. Cimons*, 53 A.D.3d 125, 127 (N.Y. App. Div. 2008).

settlement terms to avoid further litigation, which would be financially ruinous (*id.* at 1); and (iv) the terms of the parties' settlement were "fair and equitable." (State Court FF & CL ¶ 11.)  This Court sees no reason to second guess the findings of the State Court.  In addition to cash consideration provided to the Debtor in the form of monthly maintenance payments, Jones undertook the significant responsibility of becoming the primary financial caretaker for the children through college, assumed other obligations that would have otherwise been shared with the Debtor (*e.g.*, property taxes, capital gains taxes, mortgage arrears), and assumed some obligations which were the Debtor's sole responsibility (*e.g.*, Parent Plus loan, one-half share of VISA outstanding bill).

Second, the Trustee implies that the settlement was fraudulent because the transfer of the Debtor's interest in the Properties would eventually be passed on to her children.[29]  (*See* Trustee Brief at 14 ("a finder of fact could reasonably find that [the Debtor and Jones] did collude to essentially give the three investment properties to the children").)  The notion that the Properties would eventually inure to the benefit of the children had been contemplated by the parties since they entered into the Settlement Stipulations in November 2019.  (*See* Real Property Stipulation at 1 (stating that the transfer of the Properties was to "house their four children during the times they reside with [Jones], and as an . . . investment for the ultimate benefit of the parties' four children"); Global Stipulation at 1 (same).)  Indeed, the State Court explicitly ordered the Debtor to transfer her ownership in the 94 South Property to William as part of her obligations under the settlement (Amended Divorce Judgment at 6 (The Debtor "shall

---

[29]    The Amended Complaint alleges that the Debtor's interest in the 430 Central Property and the 40 Lower Property were transferred to LLCs for which Jones is the sole member, and her interest in the 94 South Property was transferred to an LLC for which William is the sole member.  (Amended Complaint ¶¶ 6-14; *see also* Amended Divorce Judgment at 6; State Court FF & CL ¶ 21.)

promptly deliver the membership certificate for 94 South Highland Avenue, LLC to

[Jones], transferring the membership interest in that LLC to the parties' son

William . . . .")), and found that Jones' Parents were financially supporting the

settlement "to preserve the real estate for their grandchildren."  (State Court FF & CL

¶ 21.)  Providing assets to a divorcing couple's children as part of a settlement is not an

uncommon practice.  *See Kamens v. Utica Mut. Ins. Co.*, 829 N.E.2d 292, 294 (N.Y.

2005) (observing that, although the primary purpose of a divorce settlement is to divide

assets between husband and wife, "parties may and often do agree to give assets to their

children"); *Pryor v. Fair* (*In re Fair*), 142 B.R. 628, 631-32 (Bankr. E.D.N.Y. 1992)

(debtor's pre-petition transfer of his interest in real property to his daughter in exchange

for ex-spouse's agreement to forego maintenance payments as part of a divorce

settlement was for "fair consideration" under New York fraudulent conveyance law).

That the parties here contemplated eventually transferring the Properties to their

children was not the product of fraud or collusion.

Third, the Trustee suggests that the Debtor and Jones directly colluded to

defraud creditors.  (Trustee Additional Fact ¶ 2.)  However, Jones stated that

communications with the Debtor had effectively ceased by 2016 (Jones Affidavit ¶ 30),

and the evidence the Trustee cites merely shows that the Debtor and Jones exchanged

emails about matters pertaining to their children.  (*See Deposition of Susan C.

Christenson*, dated Aug. 4, 2021 ("Christenson Depo. II")[30] at 207:1-4 ("I mean, the

emails would have been about the children.  That's the only thing that he . . . was able to

email me about.").)

---

[30]     A copy of Christenson Depo. II is attached as Exhibit I to the Marcus Affirmation.

Fourth, the Trustee asserts that Jones communicated his intent to defraud creditors to the Debtor's attorneys, Petito and Nesson. (Trustee Additional Fact ¶ 3.) To support this assertion, the Trustee attached email correspondence among the three individuals during the period leading up to the execution of the Settlement Stipulations and the entry of the Amended Divorce Judgment. (*See* Reich Declaration, Ex. G.) The overall tenor of these emails is that the parties were engaged in spirited discussion to finalize the settlement. Jones, who was representing himself, was particularly animated in his emails to Petito and Nesson describing the effect of the Divorce Proceeding on the family and their finances. The Trustee cherry-picks Jones' statements to support his theory, but his arguments are unpersuasive. For instance, the Trustee points to an email thread among Jones, Nesson, and Petito on September 24, 2019. (*Id.* at ECF pp. 4-8.) Jones began the thread by informing Nesson and Petito that William's bank account had been frozen by New York state because, according to Jones, "the State wrongly believes that the account is collectible from me for taxes." (*Id.* at ECF p. 7.) Petito responded that he "reviewed the Fraudulent Conveyance act" and opined that the State Court should be made aware of the existence of the tax creditor. (*Id.* at ECF p. 6.) Petito asked Jones for the amount of the tax debt, and whether it was a liability that could be paid prior to execution of a settlement agreement. (*Id.*) Jones responded that he was working to pay and settle numerous debts which will take at least a year and that the parties should not wait for all these matters to be resolved before finalizing a settlement. (*Id.* at ECF p. 5.) Jones later added that "[t]here is more than adequate consideration" for the contemplated transactions which is why the Debtor "would have contemplated this in the first place." (*Id.* at ECF p. 4.) Jones concluded by telling Petito and Nesson: "You are the ones who negotiated the consideration and now are you saying it is not

fair?  Of course it is more than fair.  I offered it as fair so she would agree." (*Id.*)  Far from being a smoking gun, these emails show that the parties had a disagreement about the applicability of a constructive fraudulent conveyance statute with Jones believing that the consideration being offered would withstand such claim.  The exchange does not show an intent to collude.

The Trustee also points to emails exchanged between Nesson and Jones in early April 2020 while finalizing a draft of the proposed findings of fact and conclusions of law for the State Court's review.  (*Id.* at ECF pp. 29-31.)  In an April 4 email, Jones asked Nesson if he had any comments to the draft and added that Jones was "considering a few revisions to the proposed Findings of Fact that may serve [the Debtor]." (*Id.* at ECF p. 30; *see also id.* at ECF p. 29 (April 6 email from Jones reiterating that he was "looking at a revision of Findings that [may] help [the Debtor] later with her creditors in or out of bankruptcy").)[31]  Nesson responded by asking a question about Jones' calculation of the Debtor's income.  (*Id.* at ECF p. 30.)  In an April 9 email, Jones answered the inquiry about the Debtor's income and described his addition to the draft findings:

> I also added to paragraph [Twenty-One] to include that my parents wished to provide for the retention of the real estate for benefit of their grandchildren and to assist with their support and education.  I included these actual facts in the Findings in order to document the truth and with a view that a Finding may help defend against the threatened attack on the outcome.

---

[31]    The Debtor was in a dire financial situation leading up to the settlement.  She had difficulties selling the Properties, could not pay mortgage arrears, was facing foreclosure, and had a modest income. (Christenson Depo. at 85:7-86:23.)  At her deposition, the Debtor recalled a colloquy with the State Court Justice as follows: "[T]he judge looked over at me, I remember clearly, and said, Susan, you are going to be destitute.  You guys have no more time in this courtroom.  You need to . . . move on." (*Id.* at 85:22-86:1.)

(*Id.* at ECF p. 31.)  Jones' paragraph was included in the findings entered by the State
Court.  (State Court FF & CL ¶ 21.)  Other than highlighting certain portions of this
email exchange, the Trustee does not explain how the inclusion of Jones' paragraph
tends to show fraud or collusion.

Fifth, the Trustee states that "Petito was inferably 'relieved as counsel' because he
wanted to avoid getting caught up in collusion and fraud between the Debtor and
Jones."  (Trustee Fact Statement ¶ 35.)  In support, the Trustee cites testimony from the
Nesson Depo., in which Nesson merely stated that Petito withdrew from representation
while negotiations were ongoing.  (*See id.* ¶ 28 (citing Nesson Depo. at 52:3-12).)  The
Trustee's theory as to Petito's motive in withdrawing from the case is pure speculation.

Sixth, the Trustee states that Nesson reimbursed $10,000 of his legal fees back to
the Debtor because he "was worried about being perceived as helping the Debtor and
Jones facilitate collusion and fraud . . . ."  (Trustee Fact Statement ¶ 7.)  As set forth
above, Nesson and the Debtor each testified that the $10,000 was paid in consideration
of the Debtor's agreement to terminate the engagement, and the Debtor added that she
agreed to exculpate Nesson as part of the termination.  (Nesson Depo. at 142:23-143:16;
Christenson Depo. at 39:2-13.)  The Trustee has failed to point to evidence from which
the Court could reasonably infer a different intent for the $10,000 payment than the
reasoning described in Nesson's and the Debtor's deposition testimony.

Seventh, the Trustee claims that the Debtor was aware that Jones did not have
the financial wherewithal to meet his obligations under the Amended Divorce
Judgment.  (*See* Trustee Brief at 3.)  However, Jones' statement that he remains in full
compliance with the terms of the Amended Divorce Judgment (*see* Jones Reply Affidavit

¶¶ 10-11) is unrebutted.[32]  In accordance with that judgment, the two older children have

completed their undergraduate degrees, and the younger two are currently attending

college, at Jones' expense.  (*Id.* ¶ 11 (stating that Jones has borrowed roughly $200,000

to finance the children's college education); *see also id.*, Ex. G (financial receipts and

statements showing payments to University of Southern California, Miami University

(Ohio), and University of Virginia).)

Last, the Trustee relies on a distinguishable case, *Pereira v. Capala*, 17-CV-3434,

2020 WL 13157532 (E.D.N.Y. Aug. 6, 2020).  In that case, a chapter 7 bankruptcy

trustee brought intentional and constructive fraudulent conveyance claims against a

debtor who transferred his interest in three properties to his spouse for $1 pursuant to a

separation agreement.  *Id.* at *2.  The separation agreement was executed mere weeks

after a jury returned an adverse verdict against the debtor in a civil action in which the

debtor was a defendant.  *Id.*  The debtor and his ex-wife moved for summary judgment

of the trustee's claims arguing that the existence of a divorce decree conclusively

establishes reasonable equivalence for the transfer of marital property.  *Id.*  In

recommending denial of the motion,[33] Magistrate Judge Gold found that there were

material issues of disputed fact as to whether the separation agreement was the product

of fraud:

> Here, genuine issues of fact remain as to whether the transfers were
> actually fraudulent and whether [the debtor] colluded with [his ex-wife] to
> conjure a divorce agreement that would shield the couple's joint assets
> from [the debtor's] creditors.  Specifically, the existence of several badges

---

[32]    Disputes regarding Jones' compliance with the Amended Divorce Judgment would presumably be
adjudicated by the State Court.  This Court has not been made aware of the existence of any such
litigation.

[33]    The matter was referred to Magistrate Judge Gold for report and recommendation by District
Judge Glasser.  *Capala*, 2020 WL 13157532, at *1.

of fraud, including the intra-family transfer, the timing of the conveyances immediately following the jury verdict, [the debtor's] continued presence at the marital home, and the modification of the couple's divorce decree five years after the fact and apparently to further their position in this litigation, precludes summary judgment in defendants' favor.

*Id.* at *17.

In contrast, the divorce settlement here was reached to bring an end to a multi-year acrimonious litigation. The settlement was not suspiciously timed to avoid an adverse judgment, and Jones provided valuable consideration in exchange for the Debtor's interest in the mortgaged Properties.

### 3.      Summary of Constructive Fraud Claims

For the reasons stated, the Debtor received "reasonably equivalent value" in exchange for the transfer of her interest in the Properties pursuant to the Amended Divorce Judgment because a valid divorce judgment conclusively establishes reasonable equivalence in the absence of fraud or collusion. The Trustee has failed to raise a disputed issue of material fact showing that the negotiations leading to the State Court's entry of the Amended Divorce Judgment were tainted with fraud or collusion. Therefore, the Jones Defendants are entitled to summary judgment on the Constructive Fraud Claims.

### C.      The Intentional Fraud Claims

Section 548(a)(1)(A) of the Bankruptcy Code as well as N.Y. DCL § 276 (repealed 2019)[34] authorize the avoidance of transfers made with the intent to "hinder, delay, or defraud" creditors. The Trustee's arguments against summary judgment of his Intentional Fraud Claims mirror his arguments made in support of a finding of fraud or

---

[34]      *See supra* note 24.

collusion addressed in the prior section.  (*See* Trustee Brief at 16-22 (arguing that

badges of fraud exist because (i) consideration provided by Jones was illusory and of

little value, (ii) the Debtor knew Jones lacked the ability to meet his financial obligations

under the settlement, (iii) Jones and the Debtor directly colluded to defraud creditors,

and (iv) the transfer of marital assets to a divorcing couple's children is evidence of

fraudulent intent).)  For the same reasons stated in the prior section, the Trustee has

failed to raise a disputed issue of material fact on the Intentional Fraud Claims, and the

Jones Defendants are entitled to summary judgment on those claims.

**D.    The Unjust Enrichment Claim**

To prevail on an unjust enrichment claim, "[a] plaintiff must show that (1) the

other party was enriched, (2) at that party's expense, and (3) that it is against equity and

good conscience to permit the other party to retain what is sought to be recovered."

*Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011) (citation,

internal quotation marks, and alteration omitted).  Nonetheless, the New York Court of

Appeals explained that the doctrine is narrow and cannot duplicate a conventional

claim:

> [U]njust enrichment is not a catchall cause of action to be used when
> others fail.  It is available only in unusual situations when, though the
> defendant has not breached a contract nor committed a recognized tort,
> circumstances create an equitable obligation running from the defendant
> to the plaintiff.  Typical cases are those in which the defendant, though
> guilty of no wrongdoing, has received money to which he or she is not
> entitled.  An unjust enrichment claim is not available where it simply
> duplicates, or replaces, a conventional contract or tort claim.

*Corsello v. Verizon New York, Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012) (citations

omitted).

Here, the Unjust Enrichment Claim duplicates the fraudulent transfer claims. (*See* Amended Complaint ¶ 181 ("The Defendants were unjustly enriched as a result of receiving [the Debtor's] interest in the Properties without providing any value or consideration to [the Debtor].").) Therefore, the Jones Defendants are entitled to summary judgment on the Unjust Enrichment Claim.

<b><u>CONCLUSION</u></b>

For the reasons stated, the Jones Defendants' Motion is GRANTED, and all claims asserted against them in the Amended Complaint are dismissed. Because the Motion is granted on the merits, the Court need not address the Jones Defendants' alternative argument that the Trustee's claims are barred by the doctrines of judicial estoppel and/or election of remedies. Counsel to the Jones Defendants shall submit an order consistent with this Memorandum Decision. Counsel to the Trustee shall schedule a status conference with the Court to be held within thirty days of this Memorandum Decision to discuss the disposition of the remaining claims asserted against the Debtor in the Amended Complaint.

/s/ Kyu Y. Paek



**Dated: February 10, 2025**
**Poughkeepsie, New York**

_____
**Hon. Kyu Y. Paek**
**U.S. Bankruptcy Judge**